STEPHEN W. BLOUNT v. JOHN, J. WEBSTER.

The titles extended by Juan Antonio Padillo, Jose Francisco Medero and Geo. W. Smyth, Special Commissioners of the State of Coahuila and Texas, appointed under the 32nd Article of the Law of the 26th of March, 1834, granting land and providing for issuing titles to the inhabitants of the frontier of Nacogdoches and those residing East of Austin's Colonies, held to be valid as well within the littoral and border leagues as without, and without regard to whether the settlers lived on the particular land granted or not.

Appeal from Harrison. Heard before the Hon. Lemuel Dale Evans.

Special Court, composed of Hemphill, Chief Justice, and James H. Rogers, Special Judge.

*Henderson & Jones* and *T. J. Jennings*, for appellant.

*W. P. Hill*, for appellee, cited The Republic v. Thorn, 3 Tex. R. 499; Edwards v. Davis, Id. 321; Goode v. McQueen's Heirs, Id. 241.

*J. W. Ardrey*, also, for appellee.

ROGERS, S. J. This suit was brought by the appellant, to try title to a league and labor of land, conveyed to him by one Wilson Ewing, and granted to Ewing on the 29th of October, 1835, by George W. Smyth, Special Commissioner of the State of Coahuila and Texas, appointed under the 32nd Article of the Law of 26th of March, 1834, granting land and providing for issuing titles to the inhabitants of the frontier of Nacogdoches and those residing east of Austin's Colonies.

The petition alleges, that the land lay within the twenty leagues bordering on the United States, and that Wilson Ewing resided within the said border leagues, on the frontier of Nacogdoches, at the date of the law of 1834, and at the date of the grant to him, and continued to reside there until long after the year 1841, and that the Commissioner, George W. Smyth, had full power and authority to issue the grant in question.

To this suit the defendant excepted : " 1st. That the land " described in said petition, is situated within the twenty fron- " tier leagues bordering on the United States of the North, " and not subject to be located, surveyed and granted on the " 29th day of October, 1835, without the assent of the Executive " of the National Government of Mexico ; and 2nd. It is not " averred in said petition that the assent of the National Gov- " ernment was obtained by Wilson Ewing, or any other person " for him, to the location, survey and grant of said land."

These exceptions were sustained by the Court below ; and it ordered that the plaintiff take nothing by his suit ; on which he has appealed to this Court.

It is well settled, as a general rule, that the assent of the Executive of the Mexican Confederacy was necessary to the validity of grants of land, like the one in question, lying in the border leagues. And it is also the well settled general rule, that this assent must be averred in the petition, and can- not be proven unless so averred. (See Goode v. McQueen's Heirs and The Republic v. Thorn, 3 Tex. R. p. 241, 499.) But whether in suits like the present, admitting the necessity of the assent of the Federal Executive, it was necessary to aver more than is averred in the petition, that the Commissioner had full power and authority to make the grant, is, under the latter authority, not so certain. It is there said (page 510) that, " in suits of this character, that is between individuals on " claims by purchase, if there be only the general allegation " that the title emanated from the proper authorities of the " State, this would be sufficient to support the action, and au-

" thorise the admission of evidence to show the title had been
" issued with the previous assent of the federal authority."

However, as this case has been argued on the grounds of the
necessity of the assent of the Federal Executive of Mexico to
titles under the 32nd Article of the Law of Coahuila and
Texas of the 26th of March, 1834, and how far, as known to
the Court, from law and history, this assent was given ; and
what are the meaning and extent of this Article of the Law ;
and this case has been brought before us for our decision on
these points, we will meet the questions presented to us.

As has been said, it is the well settled general rule, that the
assent of the Federal Executive of Mexico was necessary to
the validity of grants of land lying in the twenty leagues bor-
dering on the United States of the North.   On the revolution
of Mexico, by which she established her independence of Spain,
all the ungranted or public land within the established limits
of Mexico became the public property of the newly born State.
Subsequently the Mexican nation resolved to divide themselves
into several sovereign States, to be united together in a con-
federacy ; and the Constituent Congress of Mexico passed an
Act to this effect on the 19th of November, 1823 ; but the Act
was not published and did not go into effect until the 4th of
October, 1824.   In the meantime, between the passage and the
publication of this Act, the Government of Mexico, on the 18th
of August, 1824, passed a general law for the colonization of
the public lands lying within the limits of the contemplated
States ; and by virtue and operation of this law, the public
lands lying within the said States became severally and re-
spectively the property of the States in which they lay.

But this gift of the public lands was coupled with certain
limitations and restrictions, among which was the provision of
the 4th Article of the Law of the 18th of August, that " the
" territories comprehended within twenty leagues of the limits
" of any foreign nation, or the ten coast leagues, shall not be
" colonized without the previous approbation of the general

"Supreme Executive power." This restriction to the gift of the public lands, the State of Coahuila and Texas, on accepting the gift, assented to, and until a late date, if not always, respected and observed. Thus in the preamble of their first Act on the subject of colonization, Decree No. 16, passed on the 24th March, 1825, the Congress of Coahuila and Texas profess to act "in conformity to" "the basis established by Decree No. 72 of the general Congress," the law of the 18th of August, 1824. And the 7th Article of the Decree No. 16, enjoins on the Executive of the State, in granting lands, the observance of the restriction of the Decree No. 72. And the instructions of the Executive of the State, settled on the 4th of September, 1827, for the government of Commissioners for the distribution of lands to new colonists, who should present themselves to settle in the State according to the Colonization Law of March 24th, 1825, contain the same injunction. And when, on the 28th of April, 1832, the Congress of Coahuila and Texas, by Decree No. 190, repealed the law of the 24th of March, 1825, and substituted a new law in its place, they still observed and enjoined this restriction. But in a little more than two years after this Decree, to wit, on the 24th of March, 1834, the Congress of the State of Coahuila and Texas, by Decree No. 272, repealed the Decree No. 190, and likewise all instructions to Commissioners opposed to the provisions of this repealing Act; and while providing for a new mode of disposing of all the public lands, to wit, by public auction, they make no mention of the requisite of the previous assent of the general Supreme Executive power to the sale of lands, under the general provisions of the law, lying within the border and coast leagues. But whether it meant, in such sales, to disregard the restriction on these leagues contained in the national Colonization Law, we do not mean to say; nor is it important, for according to our belief no sales were ever made under the general provisions of the law; these provisions having soon after its passage, to wit, on the 2nd of May in the same year,

by decree No. 287 of the Congress of Coahuila and Texas been suspended, and never afterwards put in force. But there is a special provision in the law of 1834, which was never suspended or repealed, but which was carried into operation, and under which a great many titles were issued. This provision is contained in the 32nd Article of the Law, and is as follows : " To the inhabitants of the frontier of Nacogdoches, and those " residing east of Austin's Colonies, titles shall be issued to the " lands they may occupy, according to the 16th Article of the " Colonization Law of the 26th of March, 1824, and the reso- " lutions of the General Government of April and August, 1828 ; " and the Executive shall appoint one or two Commission- " ers for that object, who, without any delay, shall execute the " same at the expense of the persons interested ; and the titles " heretofore legally issued are hereby confirmed." This translation of the 32nd Article is taken from the very able " statement of the Commissioner of the Gen. Land Office," written by the Hon. George W. Smyth, (which statement we have read with much instruction,) and differs from the translation in the printed copy of the laws of Coahuila and Texas in this, the latter employs the term " occupy " instead of " may occupy," as employed in the above translation. On this point the author of the statement says (page 44—5) " I am conscious that " this translation is different from the published decrees, but " that the translation of this expression, in that collection, is " erroneous, needs but a slight examination to determine. If " the translation, ' they occupy,' were correct, the corespondent " verb in the Spanish, should be *ocupan*, in the indicative " mood ; but the verb used in this article is ' *ocupen*'—' they " ' may occupy,' in the subjunctive mood."

This article evidently embraced lands lying within the border leagues ; and it is equally evident that no further assent of the general Supreme Executive Power, was made necessary to the grants under this Article, than what was understood to have been already given ; at least this was the obvious mean-

ing of the Article, and the one which was attached to it by the officers intrusted with its execution.

As to the validity of this Article of the law, supposing that no assent of the general Supreme Executive Power had been given to its provision, and that there is any conflict with " the " constitutive Act, the Constitution of the Republic, and the " basis established by Decree No. 72, of the General Con- " gress," we say, that this neither is any longer an open ques- tion, more than the general rule that the previous assent of the General Supreme Executive Power was necessary to the grant of lands lying within the border and coast leagues.  For in view of this Article of the Law of 1834, it is said in Goode v. McQueen's Heirs, 3d Tex. R. p. 256, " had the Congress of " the State passed a law for the settlement of this land on the " border, and authorized its Executive to have granted the " same to new settlers, it might have been well questioned " whether the judicial tribunals of the State could have adjudi- " cated such Act to be unconstitutional and void, on the ground " of its repugnancy to the Federal Constitution ; it would have " presented a case of conflict between the political authority of " the State and Federal Governments ; and it might have been " insisted that it should have been settled between them, and " was beyond the control of the judicial tribunals to say that " the State Legislature had transcended its powers.    The " question may seem strange and preposterous to those who " have been accustomed to see the uniform and harmonious ac- " tion of the different departments of the Government under " the Constitution of the United States and the several States " composing the Union ; and the proposition that the judiciary " had not the authority to declare an Act of the legislature " void for its repugnancy to the Constitution, would seem to " involve a most manifest absurdity.   It will however be borne " in mind, that in all popular governments, the Constitution " embodies the will of the people, and their will is spoken " through that instrument ; and if the people have thought it

"inexpedient to repose such power in the judicial department, "but to deposite it elsewhere, their will cannot be gainsaid. "Both the Constitution of the Republic, and of the State of "Coahuila and Texas seem to have reserved this power to the "legislative department. Article 165 of the Federal Consti- "tution is as follows, viz: 'Congress alone has the right to "interpret the Constitution in doubtful cases.' In the 9th "Article of the State Constitution, in the enumeration of the "powers of Congress, will be found the following : ' To enact, "'interpret, amend, or repeal the laws relative to the adminis- "'tration and internal government of the State, in all its "'branches;' and in the Article 172, it is directed that 'the "'tribunals and courts of justice, being authorised solely for "'applying the law, shall never interpret the same, nor suspend "'their execution.' These extracts would seem to be conclu- "sive, whenever the power of the legislature to pass the Act "was the question." And again, the same decision adds, (page 258,) " If, then, there had been an Act of the State Legislature, "that gave a right of property to the grantee, without refer- "ence to the approbation of the Federal Executive, it forming "a rule of property, I would not feel myself authorised to say "that it was void, because repugnant to the general Coloniza- "tion Law of the Republic. It not being repugnant to our Con- "stitution of the Republic of Texas, nor inconsistent with our "present institutions, I would not feel myself authorized to "withhold the benefit of the Act of the Legislature of Coa- "huila and Texas from the plaintiffs below, if it would sustain "the grant under which they claim title, and the same has not "been forfeited by abandonment, if the plaintiffs below showed "that there was no impediment to their holding title so de- "rived. There can be no doubt that the Acts of the Congress "of the State of Coahuila and Texas, so far as they are appli- "cable to contracts executed and completed, and to rights con- "summated, derived from the former government by those who "were citizens of Texas at the date of the declaration of inde-

"pendence, must, in general, be regarded as the law of pro-
"perty ; and that any supposed repugnancy of the Acts of
" Congress to the State Constitution, or to the Constitution of
" the Republic of Mexico, cannot be considered ; that they are
" still in force, unless they have been abrogated and annulled
" by the Constitution of the Republic of Texas, or are other-
" wise repugnant to and incompatible with the laws and insti-
" tutions of the new government. (See Section 1 of Schedule
" of Const. of the Republic.")

Section 1 of the Schedule of the Constitution of the Republic
of Texas is as follows : " That no inconvenience may arise
" from the adoption of this Constitution, it is declared by this
" Convention that all laws now in force in Texas, and not in-
" consistent with this Constitution, shall remain in full force
" until declared void, repealed, altered, or expire by their own
" limitation."

Again, in Egery & Smith v. Power, decided at the Jan.
Term of the Supreme Court in 1855, the Court say, " The
only recognized exception to this rule," (the necessity of the
approbation of the Federal Executive, to locations within the
border and littoral leagues,) " is where a title in the reserved
" leagues has been issued under the specific authority of a de-
" cree of the Congress of the State of Coahuila and Texas.
" Such law having become a rule of property, and having been
" acquiesced in by the Congress of Mexico, (no act of that body
" having declared it null and void,) titles emanating under it
" must be respected by subsequent governments and authori-
" ties, and cannot be held null and void for the want of assent
" by the Federal Executive. (Goode v. McQueen, 3 Tex. R.
" 158.) This exception from the general rule has reference to
" titles issued under the Decree of the 26th of March, 1834."

These two decisions settle the validity of the 32nd Article
of the law of the 24th of March, 1834. But the interpretation
and construction of this Article, its meaning and extent,—these
are questions which we are called upon at this time to decide.
And here we acknowledge that we find some difficulty in mak-

ing all its parts agree ; but we have no doubt as to its meaning and effect.

It is plain that the law was intended for the benefit of all those persons who are embraced in the plain meaning of the terms employed to describe them ; that is, to all the inhabitants of the frontier of Nacogdoches at the date of the law, and all those residing east of Austin's Colonies at the same date, who had not land granted to them according to the Colonization Laws, or who were not provided for by some colonization contract.

It is equally clear that the extent of the grants to these persons is to be measured by the 16th Article of the Colonization Law of 1825, to which reference is made for this purpose. That Article is as follows : " Families and single men, who, " having emigrated separately and at their own expense, shall " wish to annex themselves to any of the new settlements, can " do so at all times, and the *same quantity of land shall be re-* " *spectively assigned them as specified in the two foregoing ar-* " *ticles ;* but should they do so within the first six years from " the establishment of the settlement, *one labor more shall be* " *granted to families ;* and single men, instead of one-fourth, " as specified in Article 15, shall receive one third." And the two preceding Articles, here referred to, are as follows : " Ar- " ticle 14. One labor shall be granted to each family included " in the contract, whose only occupation is the cultivation of " the soil ; and should the same also raise stock, grazing land " shall be added to complete a sitio ; and should the raising of " stock be the exclusive occupation, the family shall receive a " superficies of twenty-four million square varas, (being a sitio " lacking one labor." "Article 15. Unmarried men shall re- " ceive the same quantity on marrying, and foreigners who " marry natives of the country, shall receive one-fourth " more ; those who are entirely single, or who do not com- " pose a part of any family, contenting themselves rather " with the fourth part of the quantity aforesaid, which shall be

"computed to them on the assignment of their land." These references show an extension of grant of one league and one labor to families.

But, then, this reference to "the resolutions of the General Government of April and August, 1828," what does that mean? These resolutions were as follows, and addressed to the Secretary of the State of Coahuila and Texas : 1st. The resolution of April, 1828—"Most excellent Senor, His Excellency " the President having before him the note of your Excellency, "numbr. 27, of the 18th March last, with documents in which " you report upon the State in which the foreigners are found " who inhabit the twenty leagues bordering on the Sabine ; he " has directed, in conformity with the statement of your Ex- " cellency, that those who unite the circumstances of a peace- " able demeanor and a useful vocation, may possess undisturbed " the lands they have occupied." 2nd. The resolution of Au gust, 1828,—"Most Excellent Senor, His Excellency the " Senor President, having before him the note of your Excel- " lency, dated the 28th of July last, accompanied by a docu- " ment sent up by divers foreigners settled on the margin of " the river Trinity and the rivulet San Jacinto, relating to " lands being adjudicated to them in right of property, and " manifesting that it is the opinion of that Government that " said petition should be acceded to on the terms it proposes, " he has been pleased to direct, that it be communicated to " your Excellency in answer, that the Supreme Government " approves the concession of the lands they solicit, with the " qualfication that the parties interested conform to the gene- " ral law of colonization of the 18th of August, 1824, and sub- " ject to what has been reservedly said and repeated to that " Government, especially in the note of the 20th April last " relative to American families from the United States of the " North."

For the purpose of helping to explain these resolutions, we will also copy the petition of the inhabitants of the frontier of

Nacogdoches, on which the resolution of April, 1828, was adopted, (these persons being the only ones with whom we have to do at present,) also a copy of the letter of the Secretary of State of Coahuila and Texas, accompanying this petition ; and we give these documents for the further reason that they are not in print, and the profession may desire to see them.

" Most Ex. Senor President :

"The inhabitants of the Republic of North America, " settled on the twenty border leagues of the Republic of Mex- " ico, between Nacogdoches and the Sabinas, with due respect " to the exalted character of the Supreme Government, they " represent to it that their settlement was effected, by a major- " ty of them, before the sanctioning of the general law of colo- " nization ; and by the others with the tacit consent of the " local authorities, who did not embarrass it ; and it may be " said that they authorized it by assembling the inhabitants in " order to be sworn to the Constitution of Mexico ; which was " accomplished by them. They have constructed houses, cot- " ton gins, mills, and opened large farms by great labor in " making the necessary clearings on lands so rough ; where- " fore, they have considerable improvements, which are found " to be so near to each other, that a league could not be con- " ceded to each individual, without prejudice to a third party ; " that the ancient inhabitants of Nacogdoches have many " claims on various portions of these lands, because they had peti- " tioned the government for them ; but the parties representing, " believe that all of them were not legitimately conceded to them; " and at their entrance in this country they were entirely aban- " doned ; wherefore, and because they did not occupy them (take " possession of) in bad faith, they petition your Excellency to " please concede to each one of the married men four labors " and to single men one labor ; these tracts they believe to be " sufficient to include their respective improvements, by author- " izing to that effect the most Ex. Senor, Governor of the State

" of Coahuila and Texas, in order that he appoint a Commis-
" sioner to distribute the said tracts of land to them, according
" to justice and to the present petition, in the understanding
" that they declare their entire obedience to the colonization
" and the other laws of the country they inhabit, and therewith
" in any necesssary case, the duties corresponding to them, to-
" wards the beneficent Mexican Nation, which they have with
" satisfaction adopted for their mother country; whose impre-
" scriptible rights they will sustain at all hazards, for which
" they have the best disposition, the proof of which can be
" verified by the recent convulsions of Nacogdoches with the
" Political Chief of the department and the Commandant-Gen-
" eral of the arms of the district. Therefore, we petition your
" Excellency to please accede to our solicitude, Ayis, March
" 10th, 1827. Most Excellent Senor President. (One hundred
" and sixty-eight signatures of foreigners follow.) A copy,—
" Juan Antonio Padillo, Secretary."

"Supreme Government of the free State of Coahuila
" and Texas. No. 27. Complying with the order of the Su
" preme Government communicated through the ministry in
" your charge dated 15th May of the past year, relative to am-
" plifying the information given by this Government in letter
" No. 36, of the 24th of April last, relative to the number of
" foreigners settled from the creek ' Atoyaque' to the river
" Sabinas, without the government permission, and who ask to
" be admitted, I proceed to state that by the four reports,
" copies of which I have the honor to herewith present to
" your Excellency, numbered from one to four, it is manifest
" that in the district of ' Ays' Bayou, 'Sabinas' and 'Tanaja,'
" there are settled 144 families and 34 single men; that they
" have four cotton gins and two corn mills, and those who are
" employed in working the land, have cleared and in farms
" (' labors,') 3365 arpents; the others who are not employed
" in farming, the reports referred to indicate their professed
" occupations. The buildings they inhabit are constructed of

" timber, covered with boards, and floored with plank.   Their
" value is estimated from $200 to $800, each, according to its
" accommodation and capacity.

    " By reports from the district Alcaldes of the frontier, it ap-
" pears according to the lists referred to, that some individu-
" als are not of good repute, perhaps on account of crimes
" committed in their native country, or on account of personal
" moral defects ; criminals guilty of atrocious crimes, persons
" of infamous character, or the vicious who are  prejudicial to
" society, beyond all doubt, should not be admitted in any part
" of the State.  But those who are respectable, laborious and of
" good moral habits, who have constructed their houses and
" cultivated their fields, it seems advantageous to concede them
" permission  for their permanently remaining in  the country,
" with the qualification that they subject themselves, by oath, to
" the Constitution and laws of the nation and of the State ; and
" that in giving them possession, in due form, of the land they
" occupy, according to the Colonization Laws of the State, the
" corresponding titles of property might be extended to them,
" they paying to the same State, by way of acknowledgment, the
" proportional rates designated in the  Colonization Laws  of
" the 24th of  March, 1825, under the direction of a commis-
" sioner to that effect, who would be appointed by the govern-
" ment of this State according to Article 38 of said law. In ad-
" dition to the reasons already expressed in favor of those who
" could remain in the country, there is another of greater con-
" sideration ; and it is, that the inhabitants of the los ' Ays ' ren-
" dered a very important service in favor of the government by
" openly declaring themselves against the revolutionary move-
" ment of Nacogdoches, raised by Haden Edwards and his as-
" sociates in December, 1826 ; and with  their assistance the
" union of the perverse was broken up, and order, disturbed
" in that part of the State, was reestablished.    Col. Don Jose
" de las Piedras, Military Commandant of Nacogdoches, no
" doubt with the best zeal and well disposed intention, agreed

Blount v. Webster.

" with the Alcalde of that town to receive the oaths of the
" foreign inhabitants of 'los Ays, Tanaja and Sabinas,' to de-
" fend and observe the Federal and State Constitutions, the
" object being to prevent and avoid the disorders that had ex-
" isted on that frontier, as appears from the communications
" which the most Ex. Senor Commandant General of these
" States directed to me, dated the 26th November last ; a copy
" of which I herewith present to your Ex. (No. 5.) In answer
" I manifested to him on the 2nd January following, as will be
" seen by copy No. 6, that there would be a propriety in sus-
" pending the oath of allegiance to both codes by foreigners
" who inhabit the twenty border leagues, for the reason that
" there is now pending the resolution of the Supreme Govern-
" ment, a document (expediente) sent up by the same inhabit-
" ants for their admission and permanency in the country : that
" measure, in such case, might anticipate or compromit the Su-
" preme determination of the affair, or might afford either a
" motive or pretext to the foreigners to found a right thereon,
" to their permanency in the State. The most Ex. Senor Com-
" mandant General, impressed with the force of this observ-
" ation, and foreseeing the compromise that might result in
" receiving the allegiance as agreed, he directed Col. Piedras
" on the 26th November, to suspend the said act, but at the
" arrival of his order it had already been verified, as may be
" seen in copy No. 7 and its corresponding documents. Since
" that time, there came to my notice through the same most
" Ex. Commandant General, that a sensation was caused
" among those inhabitants by an official communication from
" the Political Chief of the Department of Bexar to the Al-
" calde of Nacogdoches, asking information relating to the
" order he had to accompany the Military Commandant of
" that town, to the oath he exacted of the foreigners who dwell
" on the twenty border leagues. Although it appears the sens-
" ation did exist among the foreigners, as observed in the com-
" munication directed by Col. Piedras to Senor Commandant

" General on the 8th of January of the current year ; this
" communication being one of the evidences accompanying the
" official communication numbered 8 of the 2nd March, that
" frontier is now peaceful, as is manifested in the official note
" of the Political Chief of the Department of Bexar of the 2nd
" inst. A copy of which is herewith presented with its accom-
" panying evidence numbered 8. In view of the whole of the
" aforesaid, and in view of the aspect this affair has taken, it
" seems the time has arrived to determine upon one of the two
" extremes : 1st. Either to regulate the civil or political exist-
" ence of those foreigners who at this day inhabit the border
" lands contiguous to Nacogdoches, by the means proposed ;
" 2nd. Or to eject them from the territory of the Republic by
" armed force ; because it is impossible for them to remain
" longer in an undecided state, engendering jealousy of their
" fidelity, in reason of their not being legally introduced and
" admitted.

" The government of the State, if it were in its power, would
" have determined upon the first (of these extremes,) and it is
" its opinion that such should be declared, in attention to the
" reasons set forth, and which the accompanying documents
" themselves evince ; and because an absolute ejectment would
" be cruel, and expensive to our Republic. It would cause a
" revolution in that interesting part of the State, without any
" other fruit than desolation and death.

" All of which I have the honor to report to your Excellency
" for the information of the Supreme Government, whose su-
" preme resolve I venture to recommend that it be expedited
" at the earliest possible period."

Now then the question is asked, if from all these documents
it does not appear, that the resolution of April, '1828, did not
embrace only the signers of the petition to which it responds,
or at least those foreigners only who inhabited the twenty
leagues bordering on the Sabine, at the date of the resolution ?
and whether the grant is not confined to the particular spots

of land which these persons occupied at that date ? and whether, since the 32nd Article of the law of 1834 professes to be in conformity to the resolutions of April and August, 1828, this Article is not to be restricted to this limited meaning of the resolution ? We answer, that be the interpretation and construction of the resolution of April, 1828, what it may, we do not think that the meaning of the 32nd Article of the law of 1834 is to be restricted to this limited sense. For, first, to confine it to the persons who signed the petition, or to those who inhabited the twenty leagues bordering on the Sabine, at the date of the resolution, is in direct war with the plain sense of the terms used in the 32nd Article to describe the persons whom it proposes to benefit. Secondly, such a construction is also in direct conflict with the other part of the Article, which says that the titles shall be issued according to Article 16 of the Colonization Law of the 24th of March, 1825. According to Article 16, the grants may extend to a league and labor ; but if the grant should only include the tract of land which each of the grantees occupied, or had in possession and cultivation, it could not be as extensive as grants under this 16th Article ; since the petition of these persons represents their improvements " to be so near to each other that a league could not be conceded to each individual without prejudice to a third party." Moreover, we presume that some of these persons occupied more land than others, and the letter of the Secretary of State accompanying the petition of these persons states, that some of them were not employed in farming, and of these some of them in all probability were mechanics, and some professional men, who occupied no lands at all ; wherefore, to limit the grant to the land occupied by each individual would take away all benefit of the law from some, and make a disparity between the others, which we cannot presume to have been the intention of the framers of the law. But in granting them land in conformity with Article 16 of the Colonization Law of the 24th of March, 1825, the Congress clearly express that there

is to be no other distinction between the grantees than that there mentioned, of families and single men.

How then shall we reconcile with this construction the reference to the resolution of April, 1828 ? Why, we must say, that either the proper construction of the resolution of April, 1828, agrees with this construction of the law of 1834, or, at least, that the Congress of Coahuila and Texas so understood it. And we would here have it kept in mind, that though the construction of the resolution should not agree with the construction we have drawn from the law, and the Congress of Coahuila and Texas should have misinterpreted the resolution, yet according to the principle we have before extracted from Goode v. McQueen, and Egery & Smith v. Powers, the law of 1834 must prevail. To show, however, the accordance of the resolution of April, 1828, with the 32nd Article of the law of the 26th of March, 1834, we will make the following extracts from the " Statement of the Commissioner of the General Land Office," as they are very much to the purpose, and contain much historical information that we have not elsewhere. In treating of the resolution of April, 1828, he says : " This grant " is co-extensive with the reasons by which it is recommended, " to which consequently we must have recourse in order to un- " derstand the extent of it ; this is the Decree of April, 1828.

" The petition on which the Decree of August, 1828, is " founded, is assigned (signed ?) by seventy-three persons whose " names are preserved, being attached to a copy of the petition " on file in the General Land Office ; but the names which " were signed to the petition which produced the Decree of " April, 1828, are not preserved, nor does it appear that the " names were sent by the State to the Federal Executive, but " at the conclusion of the copy of this petition which was sent " up, the Secretary of State says : ' Most Excellent President,' " (here follows the signatures of one hundred and sixty-eight " foreigners ;) ' this is a copy, Juan Antonio Padillo.' The Sec- " retary says, indeed, ' that by the four communications which in

" copy I have the honor to forward to you, marked with the Nos. " from one to four, it appears that in those districts of Bayou " Ayish, Sabine and Tenaha, there are settled 144 families and " 34 single men.' This is represented as composing the entire " population of these districts of country at the time ; but the " names of the petitioners, as such, are not given.

" This petition is accompanied be a very able communica- " tion from the Secretary of State, Juan Antonio Padillo, in " which he recommends it upon broad and general reasons of " national policy. He says, ' In view of all the foregoing, and " in attention to the aspect this matter has taken, it seems that " the time has arrived to resolve on one of two extremes : 1st. " Either to regulate those foreigners who inhabit the boundary " lands of Nacogdoches, by civil and political authority, by the " means above proposed ; or 2d, that they shall be driven from " the territory of the Republic by an armed force ; because it " is impossible that they should remain for any longer time in " an uncertain state, infusing doubts of their fidelity, for the " reason that they are not legally introduced and admitted. " The government of this State, if authorized, would have re- " solved on the *first*, and it is of opinion that such should be " the declaration, in attention to the reasons that have been " given, and which are contained in the annexed documents, " and because an absolute ejectment of them would be cruel, " and expensive to our Republic, which would give place to a " revolution in that interesting portion of our State, without " any other fruit than desolation and death.'

" It will be readily perceived, that all the reasons here given " are very general and comprehensive, and are not more appli- " cable to those whose names were *assigned* to the original pe- " tition, than to all others who were then settled on the bor- " ders ; and notwithstanding some of the reasons adduced in " this communication were applicable only to those who were " then in the country, (such as the merit of having assisted in " suppressing the Fredonians in Nacogdoches,) yet those above

" quoted were not more applicable to persons then settled on
" the borders, than to such as might come afterwards and
" whom the Commissioner might find within those limits when
" he came to put them in possession. That such was the con-
" struction placed on this Decree by the State authorities, I
" will proceed to show.

" It is a well known fact, that Juan Antonio Padillo came
" to Nacogdoches in the beginning of the year 1830, to give
" titles to settlers whose residence on the borders had been le-
" galized by the Decrees of April and August, 1828 ; it is also
" well known to those conversant with the history of those
" times, that he granted orders of survey, and took the incipi-
" ent steps towards extending titles to all those who produced
" the proper proof of the moral qualifications required by those
" Decrees, or, more properly speaking, by the Colonization
" Laws of the State. Under the authority of those orders of
" survey, a large amount of surveying was done, when he was
" suddenly arrested on a charge of being accessory to the mur-
" der of a Mexican, and being under a criminal prosecution,
" his functions as Commissioner were necessarily suspended
" according to the Constitution of the State, until his trial and
" acquittal. (Laws and Decrees of Coahuila and Texas, page
" 316.)

" Jose Francisco Medero was appointed in September of the
" same year to supply his place as Commissioner. The Gov-
" ernor, after having directed him to procure from Padillo the
" various documents in relation to his commission, says to him,
" ' And with the entire regulation of the instructions and or-
" ders which have been passed to him, you will proceed to the
" conclusion of this business, *without changing anything which
" has been done by the former Commissioner, without the express
" orders of this Government.*' " (Vol. 44, p. 2, Archives Gen.
Land Office.)

To the same purport I will now quote from a letter from
Juan Davis Bradburn to Medero, dated Jan. 29th, 1831.

" Military Commandancy of Galveston. In the Texas Ga-
" zette of the 15th instant I have read with great satisfaction
" the notice which you give to the public of your arrival at
" San Felipe de Austin with the special commission to conclude
" the business pending of Juan Antonio Padillo, and the invi-
" tation which you give to those whose lands are not yet de-
" lineated, being one of the measures most interesting to the
" happiness of the country.' (Vol. 44, p. 5.)

" I will now quote from a resolution of the Council of Gov-
" ernment of the State dated August 5th, 1833. ' The same
" practice should be observed with regard to those concessions
" which were made by the Citizen Juan Antonio Padillo in the
" time that he was Commissioner and the acting Surveyor, the
" parties interested not having obtained their titles. Inasmuch as
" the Citizen Juan Antonio Padillo does not *now* possess autho-
" rity for the purpose of completing them, it is reasonable that
" he who despatches the titles should regulate the surveys, as he
" is personally responsible for all the acts or measures effected
" or practised by him in contravention of the Law of Coloni-
" zation.' (Vol. 51, p. 105.)

" Again, in recapitulating, ' 3rd. The concessions which have
" been spoken of in the preceding articles, which were sur-
" veyed by the citizen Juan Antonio Padillo in the time that
" he was Commissioner, the owners of which have not received
" their titles, shall be resurveyed according to the law under
" which they were granted.'

" This, in effect, was uniformly done ; the land was either re-
" surveyed, or (which more frequently happened,) the Surveyor
" who did the work, took an appointment as Surveyor under
" the new Commissioner and returned his work under his re-
" sponsibility to him.

" I will here quote again from the communication of the Po-
" litical Chief to the Military Commander of Texas. He says :
" ' The foreigners *who reside (que reciden)* between the rivers
" Trinity and San Jacinto, and from the Atoyaque to the Sabine,

"have obtained this approbation. the second by the Decree of
"of the 22d April, and the first, by that of the 27th of August,
"1828.' This communication is dated February, 1831. He
"speaks in the present tense—' the foreigners *who reside.*'

"If we now turn to the 32nd Article of the law of 1834, we
"shall find it to the same purport. ' To the inhabitants of the
"frontier of Nacogdochs, and those residing east of Austin's
"Colonies, titles shall be issued,' &c. This language plainly
"and literally construed, certainly embraces all the inhabitants
"east of Austin's Colonies and on the frontier of Nacogdoches
"at that time.

"I will add another quotation which is translated from the
"commission of one appointed under the authority of the Ar-
"ticle above quoted. The Governor says : 'In exercise of the
"powers conferred on me by the 32nd Article of the law of
"the 26th of March of the year last passed, relative to the va-
"cant lands of the State, I have appointed him Special Com-
"missioner for the issuing of titles to the *inhabitants who reside*
"*in the Department of Nacogdoches.*' (Vol. 24, p. 1.)

"Let us now introduce the following communication from
"the Political Chief of the Department of Bexar to the Gov-
"ernor of the State, on the subject of these border league set-
"tlers, and which is strongly corroborative of the position
"here assumed. It may be remarked concerning the docu-
"ment here translated, as well as some others, that it does not
"wear an imposing official garb, being a *"borador,"* or rough
"draft of the communication *sent.* Nevertheless it is found
"among the archives received from Bexar, and there is suffi-
"cient evidence of its genuineness.

"'No. 111. *Most Excellent Sir :*—By verbal information
"received from the citizen Stephen F. Austin, and that which
"has been communicated to me on this subject by the Surveyor
"Thomas Jefferson Chambers, of date the 18th of 'May last,
"I am convinced that in consequence of the occurrences in Na-
"cogdoches against the Commissioner General, Don Juan An-

" tonio Padillo, by a criminal accusation, which appears against
" him ; and in consequence of the resolution of the Hon. Con-
" gress of the State, of the — of April preceding, which your
" Excellency was pleased to direct to me under date of the
" 14th of the same, which reduces to one only colony the afore-
" said commission ; it has come to my knowledge that these
" occurrences have disturbed the minds of the foreign inhabit-
" ants established within the twenty border leagues, from the
" Atoyaque to the Sabine, and other points to the East of said
" Austin's Colony, to such a degree that they should persuade
" themselves, that all is with the object to paralyze coloniza-
" tion, and to impede the issuance to them of the titles of pos-
" session to the lands which correspond to them ; and they de-
" sire with anxiety, to secure a permanent residence in the
" country.

" For this reason said Austin and Chambers have thought
" proper to recommend very particularly, in answer to your
" letter, that by whatever means may be in your power, and
" prudence may dictate, to pacify the minds of these inhabit-
" ants disturbed by the occurrences in relation to Juan An-
" tonio Padillo, and by their erroneous opinion as to the dis-
" position of the Supreme Government, which has given them
" repeated evidences of the paternal affection with which it
" looks upon and attends to the augmentation and security of
" their persons and interests. (' Mira y atiende al aument y
" siguridad de sus personas y intereses.') But nevertheless it
" appears to me proper that I should manifest to your Excel-
" lency, that nothing but the immediate presence of a Commis-
" sioner on that frontier will be able to cause these errors to
" vanish, which these inhabitants have practiced on them-
" selves ; disposing, if possible, that the Commissioner to regu-
" late the business of the settlers established within the said
" twenty border leagues, falls on a person illustrious for his
" judgment and prudence ; that he may be able without dis-
" turbance or reproach to level whatever difficulties may pre-

" sent themselves. whether in consequence of the claims of the
" ancient citizens of Nacogdoches, or those which are offered
" by the labors which have been commenced in those points by
" the said Commissioner and Surveyor.   Upon which interest-
" ing points no doubt your Excellency will be pleased to fix
" your high consideration, and communicate to me other meas-
" ures you may think proper.'   ' Ramon Musques—To his Ex-
" cellency, the Governor of the State of Coahuila and Texas,'
                    ' EXTRACT (EXTRACTO.')
" Communicates the news which he had received of the in-
" quietude which had been produced in the minds of the colon-
" ists ('colonos') established within the twenty border leagues
" of the frontier, and the part to the East of Austin's Colony
" at the imprisonment of Don Juan Antonio Padillo ————;
" the measures which have to be taken to pacify them, and pe-
" titions as the only remedy which will tranquilize them, the
" immediate presence of a Commissioner, who should issue the
" titles of possession ; indicating the quantities which should
" adorn this individual for the proper discharge of his commis-
" sion.'   (Vol. 53, Page 31.)

    " It will be perceived from this translation in connection
" with many others on the same subject, that it had become a
" matter both of national and State policy to tranquilize the
" inhabitants of the twenty border leagues, by granting them
" land and placing them on a footing of equality with colonists
" of other portions of the State.   This was the policy recom-
" mended to the General Government by Padillo himself as
" Secretary of State.   This was the policy pursued by the Fed-
" eral Executive in making the liberal grant of April, 1828,
" which resulted in the appointment of Padillo as Commis-
" sioner, and now on the occurrence of his arrest and the sus-
" pension of his functions as Commissioner, this policy is
" pressed upon the attention of the State Executive, as the on-
" ly means of allaying the excitement and reconciling the peo-
" ple to the Government.   One very striking contrast, how-

" ever, presents itself between this communication of the Poli-
" tical Chief, and that of the Secretary of State, which pro-
" duced the decree of April, 1828 ; the former was addressed
" to the Federal Executive, but now the consent of the Fed-
" eral Government having been obtained, the latter is addressed
" to the Governor of the State, as the functionary who alone
" possessed the power of applying the proper remedy. The
" instruction to Medero (who was appointed in the latter part
" of the same year) ' not to change anything which had been
" done by the former Commissioner, without the express orders
" of the Government,' was carrying out the same views and
" consummating the same policy. By the way it may be re-
" marked that in this document the first reference is made to
" the 'inhabitants residing East of Austin's Colony,' as contra-
" distinguished from those upon the border leagues, a distinc-
" tion which was afterwards incorporated into the 32d Article
" of the law of the 26th of March, 1834."

" The Political Chief in the document here translated, speaks
" of the inhabitants generally, and not of a portion of these in-
" habitants, and he recommends a general measure of concilia-
" tion for the purpose of 'tranquilizing these inhabitants.'—
" Now since the petition of the people of these districts in
" 1827, or the decree of the Federal Executive in 1828, their
" population was probably doubled, and it cannot be fairly in-
" ferred, that this measure of conciliation was intended to ex-
" tend to those only who resided in the country in 1827 or
" 1828, which would have been but a partial remedy—contra-
" ry to the language used, and contrary to the objects to be ac-
" complished. But was the Polical Chief recommending to the
" Governor a high handed measure in violation of the rights
" of the Federal Government ? Shall presumption be perpetu·
" ally indulged against the acts of the State authorities ?"

" It appears unquestionably, from the foregoing communica-
" tion of the political Chief, that in his opinion as well as those
" of Messrs. Austin and Chambers, the power of 'tranquilizing'

" the people and removing all their apprehensions by granting
" them titles to their lands, vested exclusively in the State
" Government. Abundant evidence might be adduced to show
" that the people of the twenty border leagues held the same
" opinions, and that to quiet their apprehensions on the sub-
" ject of their lands, it was only necessary to convince them
" of the 'paternal affection' of the State Government. As
" corroborative of this statement I will here transcribe a para-
" graph from a circular letter, addressed by the latter gentle-
" man to the people of that district, dated July 1st, 1830 :

" He says : ' But I have the fullest confidence in the paternal
" affection of the *Government of the State* towards these colon-
" ists, and in the liberal policy of the distinguished statesman
" who directs its helm ; and I am informed that measures are
" taking for the prompt conclusion of the business,' (i. e. the
" business commened by Padillo.) The only object in trans-
" cribing the above passage is to show, that the only argument
" thought necessary to be used with these people at this period,
" was to assure them of the 'paternal affection of *the Govern-
" ment of the State.*' As further evidence that the people re-
" lied exclusively on the State Government, it may be stated,
" that with one single exception—that referred to and con-
" demned by Medero in his letter already quoted,—no attempt
" seems to have been made by the people settled in those dis-
" tricts, to obtain the approbation of the General Government
" subsequent to 1828 ; with such implicit confidence did they
" rely upon the opinion, that the prohibition of the General
" Government was entirely removed with regard to them-
" selves."

The author of " the statement," after refering to the various
decrees of the Legislature of Coahuila and Texas, and giving
them a construction, about which, there, perhaps, might be
some difference of opinion, proceeds with observations, which
might well apply to the 32d Article of the decree of the 26th
of March, 1834, and the acts of the officers charged with its
administration, (viz :)

Blount v. Webster.

" Moreover these Acts of the State authorities were done with
" the knowledge of the Federal Government, and if not with
" its approbation, at least without any complaint on its part.
" Of the truth of this assertion, the annulling Act furnishes
" strong presumptive evidence, for in that Act they assume the
" high prerogative of annulling an Act of the Legislature of a
" sovereign State—thus evincing that the Acts of the State
" authorities did not escape their notice, and that they were
" not over scrupulous in animadverting on such as did not
" suit them. But so far as the State is concerned, her inten-
" tion at this period is beyond all question."

Again—" In the case of the heirs of McQueen v. Samuel
" Goode, the Supreme Court held the following language : 'It
" is clear that whatever obscurities there may be in the law
" referred to, its benefits were designed for those only
" who at the time occupied the lands for which they were to
" receive titles.' "

" All the circumstances considered, it is not astonishing that
" the Supreme Court should have come to this conclusion : the
" various documents which throw light upon this subject were
" not before the Court. Even the decree of April, 1828, was
" not before them. Nevertheless, if the Court intended to be
" understood by this, that the settler was bound to be an actu-
" al resident on the very spot included in his survey, in order
" to make his title valid, I am forced, however reluctantly, to
" come to a different conclusion.

" Let us endeavor to trace this phrase, ' *que ocupen,*' which
" occurs in the 32d Article of the law of 1834 to its origin.—
" In the year 1827, the people of the Ayish Bayou, &c., &c.,
" addressed a petition to the Federal Executive of Mexico ;
" they represented among other things, that they were not only
" settled on the border leagues, but they were likewise settled
" on certain old claims which had been granted to the ancient
" inhabitants of Nacogdoches ; but that inasmuch as they found
" the country abandoned at their ingress, they were not ' *occu-*

"*pants in bad faith ;*' they also represented that they were
" settled so near each other, that they would not be able to
" get a league of land without interfering with each other ;
" they therefore prayed the Government to grant to each fam-
" ily four labors of land, and to each single man one labor, with
" the extraordinary privilege of taking the lands which they
" occupied, notwithstanding it had been previously granted to
" others.

    " The Governor of the State in forwarding this petition to
" the General Government, (as already stated,) accompanied it
" with an elaborate and able communication from the Secretary
" of State, in which he urges by many cogent reasons of na-
" tional policy, the propriety of admitting them to the priv-
" ileges of colonists. He says : 'But those who are moral and
" industrious, of good moral habits, who have made their hous-
" es and farms with utility ; it seems proper to grant them
" permission to remain permanently in the country, with the
" condition of subjecting themselves, by the oath of allegiance,
" to the constitution and laws of the nation and of the State ;
" and that possession be given them in due form, of the land
" which they occupy, according to the law of colonization of
" the State ; granting to them the correspondent titles of pro-
" perty ; (they) paying to the State as an acknowledgment, the
" proportional charges indicated by the law of colonization of
" the State, of the 24th of March, 1825, under the direction of
" a Commissioner appointed for the purpose by the Government
" of this State, according to the 38th Article of said law.'

    " Here the privilege which they asked in their petition, of
" having the lands granted them which they *occupied,* notwith-
" standing the pre-existing claims to the same land, was re-
" commended by the State Government.

    " In the decree of the President their desire is again re-
" sponded to affirmatively ; this decree is as follows : 'He'
" (the President) ' has ordered, in conformity with the repre-
" sentation of your Excellency, that those who unite the cir-

" cumstances of a pacific conduct to some useful profession,
" shall have quiet possession of the lands which they have oc-
" cupied.'

" Thus I have endeavored to trace the expression *'que ocu-*
" *pen,'* which occurs in the 32d Article of the law of the 26th
" of March, 1834, from its origin, through the ramifications of
" the various documents accompanying the resolution of the
" Federal Government of Mexico of 1828, and connected with
" it. I will now trace it through the resolution of August of
" the same year. The people in their petition say : ' Since not-
" withstanding the General Congress suspended this law,' (law
" of the 4th of Feb., 1823,) ' on the 14th of April of the same
" year, this decree was not published, for which reason it could
" not be known ; that about the middle of the year 1825, there
" came to their notice' (i. e., the petitioners,) ' the second gen-
" eral law of colonization of the 18th of August, 1824, which
" excepts (*'exceptua'*) the border and littoral lands. In virtue
" of which they did *occupy this* (*'ocupaban este'*) in good faith,
" improving so far as they were able, persuaded that the lands
" which they *occupied,* (*'ocuparan'*) according to the provisions
" of said law of the 4th of Feb., 1823, would be partitioned to
" them, which law did not *except* (*'exceptua'*) any land.' "

" In this petition, expressions derived from the verb *'ocupar"*
" ' to occupy, to take possession of,' twice occur, evidently re-
" fering in the first expression, and most probably in the second
" also, not to the particular spot which they may chance to
" have inhabited, but to the ten coast leagues as the *place* of
" their residence—' which excepted the border and littoral
" lands. In virtue of which they did occupy *this* in good
" faith.' The pronoun *este, this,* as is well known, has the same
" meaning in Spanish that it has in English : it refers to the
" last thing spoken of, which in this case was the coast
" leagues.

" The Governor forwards this petition, and recommends in
" general terms. that ' those inhabitants should have land con-

" formably to the law of colonization, provided always that " they combine the qualities and circumstances which this law " enacts ; that they subject themselves to the law, Federal and " State, and that composing part of the families to which the " land corresponds which they respectively inhabit, they may " be considered as new colonists, and be subject to the burdens " and obligations of such.'

" The decree of the Federal Executive says : 'He' (the Pres- " ident) 'has seen proper to direct me to say to your Excel- " lency in reply, that the Supreme Government approves the " concession of the lands which they ask, upon the condition " that they conform to the general law of colonization of the " 18th of August, 1824,' &c.

" The Governor of the State, in communicating this resolu- " tion to the political Chief of the Department of Bexar, says : " 'For the adjudication of lands to the foreigners of which it " treats, I will commission a person of my confidence, that he " may carry it into effect in conformity to the laws and in- " structions in the matter.' What laws ? What instructions ? " Evidently the laws of colonization, and the instructions to " Commissioners of the 4th of September, 1827.

" The Political Chief, in acknowledging the receipt of the " foregoing communication, says to the Governor : 'Most Excel- " lent Sir : The order of his Excellency, the President of the " Republic, of the 27th of August of the present year, which your " Excellency was pleased to inclose to me in your official com- " munication of the 11th of November last past, by which is " conceded to the foreigners who have established themselves " upon the margin of the river Trinity and creek San Jacinto, " the right of property to the lands which they *occupy*, with " the pre-requisite that they owe subjection to the general law " of colonization, and other orders relative to the introduction " of North American families ; and that they present them- " selves to the Commissioner whom the Supreme Government " will nominate, in order that he may give possession and

" issue the titles to said lands.'   Here the word occupy again
" occurs, though not found in either of the  previous communi-
" cations of the President or Governor.

" The next occasion in which this word *'ocupar'* ' to occupy,
" to take possession of,' or its derivatives appears, is in the
" 32d Article of the law of the 26th of March, 1834, in which
" this language occurs : ' To the inhabitants of the frontier of
" Nacogdoches, and those residing  east of Austin's Colonies,
" titles shall be issued to the *lands they may occupy*, accord-
" ing to Article 16 of the law of colonization, of the 24th of
" March, 1825,' &c., &c., &c.

" Thus I have endeavored to trace this expression through
" all its ramifications, from its first inception in the petition of
" the people of the frontier of Nacogdoches, down to its con-
" summation in the 32d Article of the law of 1834, in none of
" which has it been intended, as I conceive, as a restriction on
" the privileges of the settlers ; and to this conclusion I am led
" by the following reasons.

" The whole tenor of the recommendation of the State Gov-
" ernment to the petition of these settlers, was that all cause
" of complaint should be removed from them, by placing them
" on a footing of the most perfect equality with settlers in
" other portions of the country ; hence it is recommended that
" lands should be granted to them according to the colonization
" laws, which would, of course, have been a league or rather a
" league and labor to each family ; but this privilege would have
" been perfectly nugatory, if they could only have taken the spot
" on which they claimed to be settled, for they had already repre-
" sented to the Government, that they could not obtain more
" than one-sixth of this quantity where they were settled, with-
" out interfering with each other.   Moreover, the State Gov-
" ernment represented that some of these settlers were not ag-
" riculturists, some of the latter class might have been mechan-
" ics, others were probably professional men ; most of these
" must have been entirely cut off from the benefits of the pro-

" vision. Again : it was represented that there were thirty-
" four single men ; for these the petitioners asked one labor ;
" but as is usually the case with such persons, most of these
" young men were probably attached to other families, and
" were not settled on any land which they could call their own
" under this restriction of the grant. But neither the State
" nor General Government manifested the slightest disposition
" to curtail the petitioners, in the privileges asked by them.

" This construction of the law is likewise opposed by the
" whole current of cotemporaneous construction ; and in proof
" of this, I need only to produce two examples : The first is
" that of Juan Antonio Padillo. Whatever authority that
" Commissioner possessed, of granting lands on the border
" leagues, was under the resolutions of the Federal Govern-
" ment of April and August, 1828, and his appointment by the
" State Government as Commissioner General of the State ;
" but he was far from confining the settlers to the lands on
" which they were settled. Now we have in the Land Office
" a resolution of the Council of Government of the State of
" Coahuila and Texas, censuring severely many of the measures
" of Padillo—charging him with an usurpation of powers
" which belonged exclusively to the Legislature. Yet no com-
" plaint is made, that he had allowed settlers to survey lands
" on which they did not reside, though the fact must have been
" well known. (Vol. 51, Page 85.)

" In proof that the State Government did not complain, but
" actually recognized the acts of Padillo, I refer to the quota-
" tions already made from a resolution of the Council of Gov-
" ernment of the 5th of August, 1833.

" Again : Jose Francisco Medero, was commissioned by the
" State, to complete the unfinished business of Padillo, and
" grant titles to lands under the resolutions of April and Au-
" gust, 1828. It is a well known fact, that he was watched
" with the most jealous vigilance by Col. Bradburn, Military
" Commandant of Anahuac ; it is also well known to many,

" who were witnesses, that he was conveyed by Bradburn from
" Liberty to Anahuac, and there kept in confinement for some
" time as a prisoner.   He was finally released and suffered to
" proceed with his duties as Commissioner, still closely watched
" in all his movements by Bradburn.  Yet he by no means
" confined the settlers to the lands on which they actually re-
" sided, but suffered them to go and select their lands, as all
" other settlers had been allowed to do, in other portions of
" the country.   But this did not so much as afford a pretext
" to the military officer who watched him, ready to take ad-
" vantage of every false step.  Nor do I find in the official
" correspondence in relation to Padillo and Medero, any com-
" plaint that they granted lands to those who were not in
" actual occupancy of the land granted at the time the grant
" was made.

    " Padillo's title to James Gaines begins as follows : ' Juan
" Antonio Padillo, Commissioner General of the Supreme Gov-
" ernment of the State of Coahuila and Texas, for the partition
" of the vacant lands of said State : For as much as James
" Gaines has been received as a *new settler*, (*nuevo poblador*,)
" in the twenty leagues bordering on the Sabine, in virtue of
" the resolution of the Supreme Government of Mexico, of the
" 22d of April, 1828, and the said James having proved that
" he is married, and unites in his person the requisites of the
" law of colonization of this State of the 24th of March, 1825 ;
" in conformity with said law, and the instructions which
" govern me, of the 11th of September, 1827,' &c., &c.

    " And again in its proper place in the title he says : ' re-
" maining notified that within one year he is bound to con-
" struct permanent land marks in every corner of the survey,
" *and that he is bound to settle and cultivate it in conformity*
" *with the provisions of said law.*   (Vol. 38, Page 782.)

    " The word ' occupy ' entering, as I have shown, into every
" document on the subject of these lands, from the petition of
" the settlers down to the 32d Article of the law of 1834 ; if

" the benefits of the latter law extended to those only, ' who at
" the time occupied the land for which they were to receive
" titles,' it is manifest that the powers of Padillo and Medero
" were restrained to the same class, as the same term occurs
" in the decrees of April and August, 1828 ; but the introduc-
" tion of the condition in these titles, to ' settle and cultivate
" it in conformity to law,' would be an absurdity, if this con-
" struction were correct ; and to use the very appropriate
" language of the Supreme Court : ' This is a practical illustra-
" tion of the construction given at that time, not only to the
" law, but also to the forms to be observed in obtaining rights
" under it ; and it is entitled to great consideration, because
" of its occurence so soon after the establishment of the system.'

" It is entitled to ' great consideration ' on another account.
" Padillo was the Secretary of State who recommended the
" petition which produced the decree of April, 1828, and his
" able communication doubtless had its share of influence in
" producing the favorable result. No man could understand
" better than he, the scope and intention of those decrees of
" the Federal Government.

" Medero was also an intelligent man, a jurist of reputation,
" a member of the Congress of Coahuila and Texas at the time
" the State colonization law of 1825 was passed, and was not
" likely to be mistaken on this subject.

" Medero's titles are in substance the same as those of Padil-
" lo ; he refers to all the laws and instructions referred to by
" by the latter, and says : ' he shall settle and cultivate it ac-
" cording to the provisions of said law.' (Vol. 38, Page 832.)
" And this I conceive to have been in strict conformity to the
" resolutions of April and August, 1828, that they should ' be
" considered as new colonists and be subject to the burdens
" and obligations of such.' "

" Medero also had the town of Liberty laid off, and organ-
" ized the municipality of Liberty, which was soon after
" acknowledged as one of the municipalities of the State ; thus
" fulfilling another provision of the resolutions of 1828, viz :

" that the Commissioner should be appointed under the 38th
" Article of the colonization law of 1825."

And again—" There is one other point from which we will
" view this question. The 32d Article, already referred to,
" says : ' To the inhabitants of the frontiers of Nacogdoches,
" and those residing east of Austin's Colonies, titles shall be
" issued to the lands which they may occupy,' &c. It is very
" plain, that this article embraces in its terms, all the settlers
" between the eastern boundary of Austin's Colonies and the
" Sabine, and it is equally plain that the application of the
" term 'que ocupen' is co-extensive with the persons included
" in the Article ; the municipality of Nacogdoches extended
" over the same district of country, except that portion which
" had been cut out of it to form the municipality of San Augus-
" tine ; part of the population included within the jurisdiction
" of Nacogdoches resided on the border leagues and part of
" them did not. It is evident that whatever restriction the
" 4th Article of the national law might have laid those under,
" residing on the border, it could not possibly affect the rights
" of those injuriously, who resided westward of those limits.—
" They possessed all the rights secured to them by the coloni-
" zation law of 1825, and it cannot be supposed for a moment,
" that it was the intention of the Legislature of Coahuila and
" Texas, to take from them by the law of 1834, any of the
" rights which they possessed under the previous law. We
" are under the necessity, therefore, of giving to this expression
" a construction which will not interfere with the previously
" acquired rights of the settler under the 'Amparo' ; but this
" construction, to be consistent, must be general, as it is equally
" extended in the 32d Article to all who are embraced in it."

In making these extracts from " the statement," we are not
to be regarded as assenting to all the views and reasons of its
author, but they are the opinions of a gentleman of high intel-
ligence, conversant with the subject, and whether they succeed
or not in satisfying the mind, of the correctness of the con-

struction put by their author, on the resolutions of April and August, 1828, are yet sufficient to show, by their reason, but particularly by their evidence of the construction placed on the resolutions on and after their adoption, and especially by those who acted under them, that it is most probable that this was the view taken of the resolutions by the framers of the law of the 26th of March, 1834. And when, to this we add, that no other interpretation of the resolutions will agree so well with the plain and obvious meaning of the 32nd Article of this law, we are forced to conclude that such was the fact; and whether the Congress of Coahuila and Texas was right or wrong in their construction, is immaterial.

To the view we have taken of the 32d Article of the law of the 26th of March, 1834, we would add, that such was the construction given to the law by the Commissioner who was appointed to issue the titles under it; and it is said in the case of Jenkins v. Chambers, 9 Tex. R. p. 235 : " We have heretofore decided that the construction of their powers and of the " laws which conferred them, adopted and acted. upon by the " former authorities of the country, must be respected, unless " it be clearly shown that they have exceeded their powers, or " have acted in *manifest* contravention of law. (Hancock v. " McKinney, 7 Tex. R. 384.) *Acts done, and rights justly ac-* " *quired under such construction, will not be disturbed.*" Now a great many titles were issued by the Commissioner, under this construction of the law, which acts were never questioned at the time; and a multitude of rights have been justly acquired under such construction; to overthrow which by a subsequent construction at this day, would inflict such extensive and serious injury, that we shrink from its accomplishment.

In conclusion we would add, that we think it in proof from the history of this State, that the titles issued by the Commissioner under the 32d Article of the law of the 26th of March, 1834, have always been regarded by the Government as valid; and have even had its express sanction and assent. Thus in

less than five months after the date of the grant in this case, and in one year, one month and six days after the date of the commission, under which all the titles under the 32d Article of the law of the 26th of March, 1834, issued, when we may suppose that these titles were fresh in mind, the convention which framed the constitution of the Republic, while legislating against illegal grants, and declaring void all eleven league claims located in the twenty border leagues, (which claims issued under the laws of the 20th March, 1825, and 2d of May, 1832, which continued the restriction on the settlement of the border leagues, prescribed in the national colonization law of the 18th of August, 1824,) yet made no question of the grants for a league and labor issued by the Commissioner under the 32d Article of the law of the 26th of March, 1834. And again, on the 9th of January, 1841, the Congress of the Republic of Texas, while declaring by law, that it appeared that the location of land claims made prior to the 17th of March, 1836, on the twenty frontier leagues bordering on the United States of the North, were contrary to law, and that there was good reason to believe that the claims in their origin were for the most part fraudulent and void ; and providing that suit should be brought by all persons claiming to hold lands within the above mentioned border leagues, by virtue of any location made prior to the 17th of March, 1836, who might wish to try the validity of their claims ; expressly enact, " that nothing herein con-
" tained shall prejudice or invalidate the settlement or head-
" right claims of any citizens residing within the twenty bor-
" der leagues, heretofore located and surveyed, whose claim
" shall not exceed one league and labor of land." And this Act expresses to be intended " that the claims of the people
" within the above mentioned border leagues, *may be quieted*
" *and settled*." This law we look upon as an express sanction and approval of the titles which issued under the 32d Article of the law of the 26th of March, 1834. And in all the legislation of this State against illegal and fraudulent claims, we find

not one instance where any question has been expressed or intimated of the validity of these titles.

The judgment of the District Court is reversed, and the cause remanded for further proceedings.

Reversed and remanded.