## L. C. COWAN v. HENRY H. WILLIAMS.

1. MEXICAN GRANTS—CONSTRUCTION—DECREE.—Since the decision in the case of Blount *v.* Webster, 16 Tex., 616, there has been no serious effort to question the validity of titles issued under the thirty-second section of the decree of March 26, 1834, "to the inhabitants of the frontier of Nacogdoches, and those residing east of Austin's colonies," to lands, whether the same were occupied by the grantees or not.

2. SAME.—The benefits of said decree were not restricted to foreign-born colonists, but accrued equally to the Mexican.

3. SAME.—And that, too, although the privileges were granted by the Mexican government upon the petitions of the foreign colonists.

4. SAME.—It was not contemplated by the Mexican (national or State) government that any colonies should be made up exclusively of foreigners.

5. SAME.—The resolutions of the general government of April and August, 1828, had reference to the grant of titles to foreign settlers; yet the general law authorizing the issuing of titles would be construed to be an authority to extend titles as well to native as to foreign born colonists residing in the territory to which the decrees extended.

6. STATUTE CONSTRUED.—The act "to quiet land titles within the twenty frontier leagues bordering on the United States of the North," approved January 9, 1841, (Paschal's Dig., 237, 240*a*,) had no reference to titles extended to citizens on account of their headright claims. This construction was given to it when adopted, and has been acquiesced in and acted upon to the present.

7. PRACTICE—JUDGE MAY CHARGE UPON LEGAL EFFECT OF A DOCUMENT IN FOREIGN LANGUAGE.—On the trial, an instrument in the Spanish language, and of date October 15, 1835, was admitted in evidence; a translation was read without objection (it not appearing that it was made by an expert or by authority): *Held,* That no

objection could be taken to the act of a judge trying the case instructing the jury upon the legal effect to be given to the instrument in evidence. It was of no consequence how his knowledge of its contents was obtained.

8. INSTRUMENTAL WITNESSES—NOTARIAL ACT—EVIDENCE.—The omission to note the instrumental witnesses in an act of sale passed before a notary public in 1835, did not render the instrument void. The notarial act is merely the evidence of the sale, and not the sale. Though instruments thus defectively executed may not furnish full proof, yet they are admissible in evidence, and but slight additional evidence is required to supply their defects.

9. ARCHIVES OF COUNTY COURT—PROTOCOLS OF PRIVATE ACTS.— The original of an act of sale between parties, made before a judge of the first instance October 15, 1835, became, by act of December 20, 1836, (Hart. Dig., 260,) organizing County Courts, an archive in the said courts, and of which certified copies may be had and used.

10. PRACTICE—AMENDMENT, NOTICE OF.—An amendment made several terms after service of citation, setting up new boundaries to the land sued for, and requiring different evidence to rebut it, is, as to the defense, material ; and it being made in absence of the defendant or of his attorney, and on the day of the trial, is ground for new trial.

11. MOTION FOR NEW TRIAL—TITLE BY LIMITATION MERITORIOUS.— While courts ordinarily do not grant a new trial to let in a defense based upon the statute of limitations, yet where defendant has, by effect of such statute, become the owner of the land sued for, such ownership and the evidence of it are sufficiently meritorious to warrant the granting of a new trial, other sufficient cause existing.

APPEAL from Collin.   Tried below before the Hon. W. H. Andrews.

December 17, 1872, H. H. Williams brought an action of trespass to try title against L. C. Cowan and others, in the District Court of Grayson county, for a league and labor of land granted to Miguel Ybarbo on October 13, 1835.

The petition set forth the chain of title under which recovery was asked, alleging that he was the owner of the league in Grayson county, Texas, on Red river, granted to Miguel Ybarbo by the Governor of Coahuila and Texas on October 13, 1835, by title extended to said Ybarbo by George W. Smythe, commissioner of the superior government of the

State for giving possession and extending titles to the muni-
cipality of Nacogdoches; that Ybarbo, October 15, 1835,
conveyed said land to Nathaniel Amory; and that, July 15,
1843, Amory conveyed the same to petitioner, Williams. It
appeared, also, on the face of the petition, that Ybarbo was a
native of Mexico at the time he applied for and obtained the
grant, (it so appearing in the grant,) and that it was situated
within the twenty border leagues, and that the grant was is-
sued by George W. Smythe, special commissioner, under the
thirty-second article of the decree of March 26, 1834. The
grant purported to have been issued under said article by ·
virtue of the general authority contained in said "decree."
The petition contained metes and boundaries, and was other-
wise in the usual form. It was not alleged that Ybarbo, or
any person claiming through him, resided in the border
leagues on March 9, 1841, or since that date, or that the
grant was established by suit under the act of said date.
(Paschal's Dig., 237, 240a.)

In the original petition, filed December 17, 1872, the
Ybarbo grant was described as beginning on Red river, at
the mouth of Mineral bayou; thence south, west, north, and
east to the beginning, placing the survey west of the mouth
of the bayou. The petition stated that a translated land-office
copy of the Ybarbo grant was therewith filed, marked "Ex-
hibit A." Such exhibit does not appear in the record. There
is in the record, after the petition, a translated land-office
copy of the protocol of the grant which purports to be "Ex-
hibit A," but made March 18, 1875, and was among the pa-
pers of the cause December 10, 1875. The petition remained
as originally filed until December 10, 1875, the day of the trial,
when appellee filed an amended petition. In this amended
petition, appellee claimed that the metes and bounds of the
Ybarbo grant were truly set forth in a copy of the original
English field-notes of the survey, made by George Aldred,
the surveyor, which were afterwards translated into the Span-
ish language, and inserted in the grant. According to these

English field-notes, the Ybarbo grant begins on Red river, 2,200 varas east of the mouth of Mineral bayou; thence south, west, north, and east to the place of beginning, placing the greater portion of the grant east of the mouth of the bayou.

In the field-notes in the grant filed December 10, 1875, heretofore mentioned, the survey calls to begin at the mouth of the bayou, and from thence runs as set forth in the original petition.

There was a plat attached to the grant nearly corresponding with the English field-notes; but no scale of varas was given, nor was the name of the creek or river given, nor the distance from the mouth of the creek to the river corner.

The defense consisted of a demurrer and plea of not guilty.

The case was tried by a jury, in the absence of the defendant or his counsel. There is no bill of exceptions. The statement of facts shows that plaintiff read in evidence the title by George W. Smythe, as commissioner, &c., to Ybarbo, and a certified copy of the protocol (made out and certified December 6, 1873, by the district clerk of Nacogdoches county) of an act of sale in the Spanish language, executed October 15, 1835, in the usual form of conveyances at that time, before Louis Ruey, judge of the first instance of the town of Nacogdoches, to which there was but one instrumental witness, but two assisting witnesses. The testimonio or second original was not accounted for, and the copy of the protocol in evidence was in the Spanish language. There was no proof of the execution of this conveyance.

Plaintiff also read in evidence a certified copy of a deed for the Ybarbo grant from Amory to plaintiff.

There was also in evidence a certified copy of the original grant, purporting to have been made March 13, 1875, by Theodore Goldbeck, Spanish translator of the General Land Office; and also a translation made by the same party of the protocol of the act of sale from Ybarbo to Amory.

The court instructed the jury that the conveyance from

Ybarbo to Amory vested title in Amory. The plaintiff recovered judgment for the land as described in the amended petition.

The motion for a new trial was not made within two days after the rendition of the judgment, but was filed, and overruled during the term. The motion was sworn to by defendant, who is the appellant, and in substance stated that appellant would have been in attendance upon the trial of the case December 10, 1875, if he had not been prevented by unexpected sickness; that appellant resides in Grayson county, Texas, about fifty miles distant from the place of holding court; that at the time of said trial, December 10, 1875, appellant was at his said residence in Grayson county, and was sick and unable to leave home or to attend to any business, and that he remained sick, and in consequence thereof confined to his house, and unable to leave to attend court, or for any other purpose, till December 25, 1875, and that he did not hear of the trial of this cause until December 24, 1875; that soon after the institution of this suit appellant employed and retained T. C. Bass, an attorney at law residing at Sherman, Texas, to represent him in this suit, and that said Bass was so employed and retained from the time he was retained, as above stated, till the trial of this cause, and that the appellant expected and believed that said Bass would defend him in said cause, but for some reason to appellant unknown said Bass did not attend the trial, but remained at his home in Sherman, Texas, and that appellant had no other counsel, and was not represented at the trial, and Bass gave him no notice of his failure, or intended failure, to attend the trial; that on the 10th day of December, 1875, said Bass sent word by S. S. Fears to R. DeArmand, an attorney at McKinney, that he (Bass) wished him (DeArmand) to represent appellant in this cause upon the trial thereof, which was by Fears communicated to DeArmand a few hours prior to the trial; that DeArmand, on account of the fact that appellant was absent, and that he was not apprised of the facts

and merits of the case, declined to appear in the cause, or to represent the appellant in any manner, except to call the attention of the court to the demurrer and the plea of not guilty; and that said DeArmand so stated to the court, in the presence of counsel for the appellee, at the time this cause came on for trial.

These facts appeared in the affidavit of said DeArmand, which was a part of the motion for a new trial.

That appellant never owned, claimed, or possessed any land in the State of Texas, except his headright of 320 acres near Red river, in Grayson county, and east of the mouth of Mineral bayou; a certified copy of the field-notes of the survey was attached to and made a part of the motion, which shows that appellant's survey was duly made December 6, 1854, by virtue of appellant's headright, (Peters' colony, certificate No. 43, for 320 acres,) issued by the County Court of Grayson county, Texas; that appellant has always been, and is now, the owner of said certificate, which has always been, and is now, a valid and subsisting land certificate, duly issued and approved; that appellant, within less than twelve months from the 6th of December, 1854, had said field-notes, together with said certificate, returned to and filed in the General Land Office, where they have ever since been, and are archives thereof; that in the year 1854, appellant settled upon his said survey of land, and has resided upon it ever since, believing it to be his own, and that he has been in the actual, continuous, and exclusive adverse possession, in good faith, of said land, from 1854 to the present time, claiming under his said certificate and survey, during which time he has made valuable and permanent improvements upon the same, of the value of $1,500, all of which he could prove by his own evidence, and the evidence of many of his neighbors in Grayson county; that his said survey of 320 acres lies east of the mouth of Mineral bayou, and does not in any manner conflict with the Miguel Ybarbo grant as de-

scribed in the original petition, but conflicts with said grant as described in the amended petition of December 10, 1875, the Ybarbo grant as described in said amended petition and the judgment including the whole of appellant's survey; that at the time appellant located his said survey, in 1854, and for a long time subsequent thereto, no one was in possession of said Ybarbo grant, nor had said grant ever been recorded or filed for record in Grayson or Fannin county, and that appellant had no notice, actual or constructive, thereof, and believed said land to be vacant and subject to his location, all of which he can prove by his own evidence; that appellant is advised and believes that he could prove, by the former custodians of the archives in the General Land Office, that the protocol of the Ybarbo grant was never returned to or filed in the land office till long after the year 1854; that appellant could prove by his own evidence, as well as that of many of his neighbors in Grayson county, that on the ground the Ybarbo grant lies west of the mouth of Mineral bayou, and does not in any manner conflict with appellant's survey, and that said survey is in fact situated as described in the original petition; that appellant was not prepared at the trial, with pleadings and evidence, to make his defenses of limitation, possession in good faith, and improvements, and want of notice of the Ybarbo grant, &c., because he was advised and believed that such pleadings and proof were not necessary to defeat appellee's action, as there was clearly no conflict between the Ybarbo grant as described in the original petition and appellant's survey; that owing to his ill health, and the inclemency of the weather, appellant had not been able to see his neighbors, and procure their affidavits to the facts he could prove by them, as above stated.

Another ground relied upon in this motion, was that appellant had no notice of the amended petition of December 10, 1875.

The motion was overruled, and defendant appealed.

*Walton, Green & Hill* and *W. O. Davis,* for appellant.

I. The court erred in overruling appellant's demurrer to the petition—

1. Miguel Ybarbo being a native of Mexico, the grant to him was issued without authority of law, and is void. (Article 32 of the decree of March 26, 1834, Paschal's Dig., art. 739; Wilcox v. Chambers, 26 Tex., 187; Blount v. Webster, 16 Tex., 616; Edwards v. Davis, 3 Tex., 321; Goode v. Mc-Queen, 3 Tex., 241.)

2. The grant to Ybarbo being issued to a native of Mexico, without authority of law, and that fact appearing upon the face of the grant, it is null and void in all proceedings, direct or collateral. (Mason v. Russell, 1 Tex., 727; Goode v. Mc-Queen, 3 Tex., 241; Republic v. Thorn, 3 Tex., 499; Hancock v. McKinney, 7 Tex., 440.)

3. By the act of March 9, 1841, (Paschal's Dig., art. 237,) the Republic of Texas avoided and set aside all fraudulent and voidable grants in the twenty border leagues issued prior to the 17th of March, 1836, except such grants as were within the proviso of the statute.

4. Article 240a of Paschal's Digest does not embrace the titles issued under the thirty-second article of the decree of March 26, 1834, as a class, but it only embraces the claims of such citizens as resided in the border leagues at the time of the enactment of the statute.

5. The statute of March 9, 1841, is constitutional. (League v. De Young, 11 How., 200; Jackson v. Lamphire, 3 Pet., 289; Cooley on Const. Lim., 364, 367; Sedg. on Consts. and Stats., 636, 637.)

6. Whenever a plaintiff bases his right of action on an exception to a general rule, the petition is fatally defective unless sufficient facts are alleged to show that the case is within the exception.

It appears from the petition that the grant to Ybarbo was issued prior to March 17, 1836; that it lies in the border leagues, and it is not alleged that suit was brought upon the

grant, or that Ybarbo, or any one claiming through him, resided in the border leagues in 1841, or since that time.    ( Paschal's Dig., arts. 240*a*, 822, 4211, 4226; Hillebrant *v*. Brewer, 6 Tex., 52; Warren *v*. Shuman, 5 Tex., 441; Glasscock *v*. Commissioner, 3 Tex., 51; Hughes *v*. Lane, 6 Tex., 292; Peck *v*. Moody, 23 Tex., 94; League *v*. De Young, 2 Tex., 497; Hamilton *v*. Avery, 20 Tex., 634; Hart *v*. Gibbons, 14 Tex., 215.)

7. Article 32 of the decree of March 26, 1834, was repealed on the 2d of May, 1834, prior to the issue of the grant to Ybarbo, and was never afterwards in force.    (Paschal's Dig., arts. 744, 560; Wilcox *v*. Chambers, 26 Tex., 188.)

II. The court erred in its first and only instruction to the jury.

1. When an instrument in the Spanish language is offered in evidence, the court cannot judicially know its contents, and it is error for the court, in the absence of any legal evidence of the contents of such instrument, to instruct the jury in reference to its legal effect.

2. A translation of a private instrument, made out and certified to by the Spanish translator in the General Land Office, is no evidence in the courts of this State of the contents of such instrument.

3. A notarial act executed in Texas in 1835, before a judge of the first instance, in which there was but one instrumental witness, is void, and confers no right.    (Clay *v*. Holbert, 14 Tex.,189; Eschriche Law Dict., title "Instrumento Publico," sec. 3; 1 Moreau & Carl. Partidas, 228.)

III. The petition was materially amended without notice to defendant; and the motion for new trial was improperly overruled.

An amendment of the petition which changes the issues and renders a change in the pleadings necessary on the part of the defendant, and the production of evidence not on hand, because not needed to defeat the action prior to the amendment, entitles the defendant to a continuance; and when he

is prevented by providential cause from being present to insist on a continuance, he is entitled to a new trial when he shows that he has a valid defense to the petition as amended. (Fisk v. Miller, 13 Tex., 224; Cummings v. Rice, 9 Tex., 527; Sayles' Prac., 537; Tullis v. Scott, 38 Tex., 541; Spencer v. Kinnard, 12 Tex., 180; Dorn v. Best, 15 Tex., 66.)

*W. O. Davis,* for appellant, filed an exhaustive argument, discussing the points and authorities relied on.

*Throckmorton & Brown,* for appellee.—We submit to the court the following objections and counter-propositions:

1. The grant to Ybarbo was issued under the thirty-second article of the law of March 26, 1834, by George W. Smythe, special commissioner to extend titles to "the inhabitants of the frontier of Nacogdoches, and those who reside east of Austin's colonies."

2. The qualification of the applicant was a matter that was submitted by law to the commissioner, and his determination is conclusive. (Hancock v. McKinney, 7 Tex., 384; Styles v. Gray, 10 Tex., 503; Ryan v. Jackson, 11 Tex., 399; Johnston v. Smith, 21 Tex., 724; Martin v. Parker, 26 Tex., 253.)

3. The language of article 32 of the law of March 26, 1834, includes all inhabitants and residents, whether natives or foreigners.

Miguel Ybarbo resided within the limits prescribed by the thirty-second article, and was one of those embraced in its provisions. (Paschal's Dig., art. 739.)

4. The law of January 9, 1841, does not apply to the grants made by special commissioner Smythe under the thirty-second article. (Paschal's Dig., art. 237.)

6. The law of January 9, 1841, does not declare a forfeiture of title on failure to sue in twelve months, but only bars the suit against the Republic. (Paschal's Dig., art. 238.)

7. The fifth section of the law of 1841 specially excepted

this class of cases from the operation of the law. (Paschal's Dig., art. 240a.)

8. The grant to Ybarbo, if valid at the time it was issued, vested title in the grantee, and it remained valid, not having been denounced by the tenth section of General Provisions of the Constitution of the Republic. (McMullen v. Hodge, 5 Tex., 34.)

9. A statute will not be so construed as to forfeit rights acquired, unless plainly so intended. (Sedg. on Consts. and Stats., 299.)

10. If the statute could be construed to work a forfeiture of the grant, it could only be taken advantage of by the State.

11. The convention of 1836 did not annul these titles. By section 16, General Provisions of Constitution of the Republic, the Congress was forbidden to enact retroactive laws. Appellant's construction of the law of 1841 would make it in conflict with that section of the Constitution.

12. If the law of 1841 embraced this class of cases, it would be a condition subsequent, and not necessary for plaintiff to allege a compliance.

13. The law of 2d May, 1834, did not repeal the thirty-second article of the law of 26th March, 1834. It only repealed the power of the governor to sell lands under that law. (Blount v. Webster, 16 Tex., 621; Wilcox v. Chambers, 26 Tex., 197.)

14. The instrument being written in the Spanish language, was admissible to be translated by an expert. (1 Greenl., sec. 280.) Appellant's counsel having failed to object to the admissibility of the translation in evidence at the time of the trial, cannot be heard in this court on the objection.

15. The translation of the conveyance from Ybarbo to Amory was mere hearsay evidence of its contents, and was admissible unless objected to at the time of trial. Appellant's counsel sat by in the trial and permitted it to be used without objection.

16. A notarial act executed in Texas in 1835, with two assisting witnesses, is valid without any instrumental witnesses.

An instrument executed before a judge of first instance, without assisting witnesses, is not void, but, like a deed not authenticated, may be read upon proof.

If a party to a suit in the court below permits a valid instrument to be read without objection, without requiring proof of its execution, he cannot raise the objection in this court. (McKissick v. Colquhoun, 18 Tex., 147; Martin v. Parker, 26 Tex., 260; Clay v. Holbert, 14 Tex., 189.)

17. The amendment to the petition did not set up a new cause of action, and did not contain such new matter as required notice to be given to appellant. It only corrected a defective description of the land. (Turner v. Brown, 7 Tex., 490; McIlhenny v. Lee, 43 Tex., 205; Morrison v. Walker, 22 Tex., 19; Ward v. Lathrop, 11 Tex., 287; De Walt v. Snow, 25 Tex., 320; Spencer v. McCarty, 46 Tex., 213; King v. Goodson, 42 Tex., 81.)

*Hare, Bledsoe & Head*, also for appellee.—Their brief did not reach the reporters.

MOORE, ASSOCIATE JUSTICE.—Previous to the decision of the case of Blount v. Webster, 16 Tex., 616, grave doubts were entertained by many of our ablest jurists regarding the validity of the class of titles upon which this action was brought. This doubt arose from the supposed requirement of the thirty-second section of the decree of March 26, 1834, that the authority of the commissioner by whom they were issued was limited to extending titles "to the inhabitants of the frontier of Nacogdoches, and those residing east of Austin's colonies," to lands which they were occupying. But this doubt was put at rest by the decision in that case; and, so far as we are aware, there has been no serious effort since that decision to the present time to question the validity of said titles; nor does appellant now impeach the validity of

all the titles issued by the commissioner appointed to extend titles to the inhabitants of said frontier, but he contends that the authority to extend the title upon which this suit is brought was not within the power of said commissioner, because the grantee was a native Mexican, and not a foreigner, to whom alone, as appellant insists, the commissioner was authorized to extend titles.

Whether such is the correct construction of the law or not, it seems to have been held, in the case of Wilcox v. Chambers, 26 Tex., 180, that it should be regarded as finally settled, by the previous decisions of this court, that the consent of the Federal Executive of Mexico was essential to a grant of land within the border leagues, whether such grant was made to a native Mexican or to a foreigner; and though we are free to admit that it was the petitions of the foreign settlers, and their communications concerning them, which, in the main, induced the resolutions of the general government of Mexico of April and August, 1828, assenting to the granting of lands "to the inhabitants of the frontier of Nacogdoches, and those residing east of Austin's colonies," "according to article 16 of the colonization law of the 24th of March, 1824," yet it would, we think, violate the express provision of this law, as well as the general spirit of the legislative and uniform policy of both the general and State governments in granting or disposing of land to purchasers and settlers, to hold, as appellant insists, that a grant of land within the border leagues, if made to a foreign settler, would be valid, but if the settler should be a native Mexican, it should be held void.

If we examine the colonization and other laws under which lands in Texas were disposed of while an integral part of Mexico, we will find that it was not contemplated that colonists would be exclusively foreigners, or that lands were only to be granted to this class of settlers. (Paschal's Dig., arts. 211, 213, 669, 670, 686, 687, 715, 716.) But in the distribution of lands under these laws, it is expressly declared that native Mexicans shall be preferred to emigrants or settlers from

abroad. (Paschal's Dig., arts. 551, 572, 694.) And in the twenty border leagues fronting upon the United States line, and the ten littoral leagues upon the coast of the Gulf of Mexico, it was expressly declared to be the duty of the Executive to take care that no settlement should be made not composed of two-thirds Mexicans. (Paschal's Dig., art. 693.) Whether this duty was strictly fulfilled by the Executive, is now of no moment. The fact that such a provision was made in a law looking to the settlement and granting of lands within the border leagues, certainly tends strongly to negative a construction that it was illegal to grant land in the border leagues to native citizens, though such grants might be made to foreign settlers.

It is to be noted, that the thirty-second section of the law of March 26, 1834, under which this title issued, does not authorize the issuance of titles to a particular portion of the inhabitants of said frontier, but in general terms authorizes the issuing of titles " to the inhabitants of the frontier of Nacogdoches, and those residing east of Austin's colonies." And if it is answered, that although this law may, by its general terms, warrant the grant, yet, as the resolutions of the general government of April and August, 1828, only had reference to the granting of titles to foreign settlers, the State government, from which this law emanated, had no power to authorize the issuing of titles to others than those on whose behalf its consent was invoked; and that it cannot therefore be inferred that grants to native Mexicans were authorized by these resolutions, though they were inhabitants and residents of the same locality. But if we were to grant that the latter class of settlers were not within the letter of these resolutions, still it must be conceded they are certainly within their spirit; and as, according to the canons of construction of the Spanish law, it is held that matters about which special legislation seems unnecessary may be decided by similar cases provided for by law, it would follow that no objection could be made to the grant, unless, indeed, it was by the government, or some

one directly authorized to do so by it. (2 Moreau & Carl. Partidas, 1248, rule 36; 1 Febrero Mexicano, 73, 74.)

2. The act "to quiet the land titles within the twenty frontier leagues bordering on the United States of the North," approved January 9, 1841, (Paschal's Dig., 237–240*a*,) had no reference to titles extending to citizens on account of their headright claims, as they were popularly denominated. This is the only reasonable and fair inference to be deduced from the fifth section of the act. (Paschal's Dig., 240*a*.) Such was, and has been, its practical construction by those interested in these titles from the date of the enactment of the law to the present time. Not a single suit is known or believed by the court to have ever been brought to establish titles issued to colonists, or to the inhabitants of the frontier of Nacogdoches, under this law; and although hundreds of suits have been brought upon such titles, this is the first case in which such an objection is known to have been made to them. It would certainly require much plainer language than that found in this statute to justify the court in giving it a different construction than that given to it when adopted, and which has been acquiesced in and acted upon for now nearly forty years, and which, to say the least, would render it of exceedingly doubtful constitutionality.

3. No objection was made to the translation of the instrument in the Spanish language which was offered in evidence by appellee. We hardly suppose it would be denied that the court could and should instruct the jury as to the legal effect of written instruments, though in a foreign language, when there is no controversy as to the correctness of the translation, whether such translation should go to the jury or court. Nor are we prepared to say that the judge before whom the case is tried could not instruct the jury as to the legal effect of such instruments without the aid of a translator, if he is willing and feels himself competent to do so; and it certainly has not been made to appear, by anything in the record, or by a reference to authorities, that he could

not. The instrument was in the language in which our laws, judicial proceedings, and public records were written at its date. If the court judicially knows the law by which the instrument must be construed, can it not also construe the instrument? If the judge is ignorant of the language in which an instrument is written, no doubt it might be necessary for him to have the aid of those who are conversant with it. And so, also, it may be where the character of writing of a particular instrument is so difficult to decipher that some one peculiarly skilled in deciphering writings has to be called upon to read or interpret it. (1 Greenl. Ev., sec. 280.) But if the judge is satisfied without doing this, believing that he fully comprehends the proper import of the instrument, can it be made a question that he had not the proper skill to read or decipher it? And especially so where it is not shown that he failed to properly construe it? The decision of this point, however, is not necessary to the proper disposition of the case, and we need not dwell further upon it, or make any authoritative ruling in regard to it.

4. The effect of the omission to note the instrumental witnesses, in an act of sale passed before a notary public, has not been fully or satisfactorily argued; nor do the authorities to which we are cited appear to be directly in point. No doubt, unless there are instrumental witnesses present when the declaration of sale is made before the notary, the instrument is not a complete and perfect public instrument; but it by no means follows, because it is defective in this particular, that it is void. The notarial act is merely the evidence of the sale, and not the sale. Though when such instruments are defectively executed they may not furnish full proof, yet, as has been frequently held by this court, they are nevertheless admissible in evidence, and but slight additional proof is required to supply their defects. (Titus *v.* Kimbro, 8 Tex., 210; Clay *v.* Holbert, 14 Tex., 189.)

Admit that the act of sale from Ybarbo to Amory was defective, still it was an archive or paper properly in the custody

of the officer before whom the sale was declared. By the statute of 1836, organizing the County Court, it became a record of the office of the clerk of the County Court of Nacogdoches county. (1 Hartley's Dig., art. 260.) A certified copy of it by this officer is admissible in evidence. The original has all the essential ingredients of a deed *inter partes*. It purports to be made upon a sufficient consideration; is between parties apparently capable of contracting, and has apt words for conveying land according to the requirements of the law when it was made; it is signed by the vendor, and attested by the subscribing witnesses, as well as the officer before whom it was passed; and, we think, might well be held to warrant a recovery against third parties. But as the question may be more thoroughly and satisfactorily discussed on another trial, we need now make no definite ruling regarding it.

5. The only remaining question which we need consider, is the refusal of the court to grant appellant a new trial; and in this, we think, there was error for which the judgment must be reversed.

Grant that the amendment does not set up a new or different cause of action from that presented in the original petition, still it unquestionably does present an entirely different issue from that which appellant was required to meet by the original petition. Appellee's counsel admits, that if he had gone to trial upon the original petition, he must have failed. The fact that the case had been pending for three or four years, on a petition which did not require appellant to adduce any evidence whatever to defeat the action, may in some degree have lulled the vigilance of appellant's counsel, and to some extent accounts for his failure to give his personal attention to the case. But be this as it may, if the affidavit in support of the motion for a new trial is to be believed, appellant has apparently the better title to the land which he claims. He was not called upon to set up his title until the filing of the amended petition on the very day of trial. The

case was tried when he was absent, and, by reason of sickness, was unable to be in attendance upon the court. If he had been present, he would have been unprepared to try the case upon the amended petition. It cannot be inferred that he knew or consented to the absence of his counsel. If he or his counsel had been present, a continuance would have been granted on an affidavit of surprise by the amendment. The attorney who appeared in the case, through courtesy to appellant's counsel, was wholly uninformed as to the nature of his defense. He did not know that the issue was entirely changed by the amendment. It cannot, therefore, be said that his failure to ask for a continuance estopped appellant from moving for a new trial.

Appellant's counsel was unquestionably negligent; but appellee is likewise chargeable with a want of diligence in the presentation of the cause of action on which he has recovered this judgment. Is he, in equity and good conscience, entitled to retain land which the law says justly belongs to appellant, and for which the affidavits in support of his motion for a new trial warrant the conclusion he has gotten judgment by misfortune of appellant's sickness, and the improper or unexplained absence of his counsel? We think not. True, it has been often said that a new trial will not be granted to let in the defense of limitation; but that is where this defense is looked upon as in some degree immoral or as *quasi*-fraudulent. But, certainly, if appellant has the better title to the land,—which unquestionably he has, if the facts stated in his application for a new trial are true,—it surely makes no difference how he has acquired this superior title, of which the other party now seeks, by mere accident and misfortune, to deprive him.

For the error of the court in overruling the motion for a new trial, the judgment is reversed and the cause remanded to the District Court.

Reversed and remanded.